## Frazee, Executrix of D. F. Frazee v. Phoenix National Bank.

(Decided November 20, 1914.)

### Appeal from Fayette Circuit Court.

1.  Trusts—Upon Personal Property—Parol Declaration.—While it is true that in order to fasten a trust upon personal property by parol declaration the subject of the trust, as well as the cestui que trust, must be definitely declared, and the language clear and explicit, yet where, after the death of the trustee, statements of his which, in and of themselves, would not create the trust, but which, when taken in connection with other admitted facts, satisfactorily shows that the trust was originally created, the trust is held to have been created.

2.  Trusts—Judgment—Direction to Pay Note Out of Trust Fund.— A judgment against the estate of the trustee for the amount of a note upon which he was not otherwise bound, with directions to pay it out of the trust fund, is not proper where there is a judgment against his estate for the whole amount of the trust fund.

3.  Bills and Notes—Negotiable Instruments Act—Presentment.— Under our Negotiable Instruments Act declaring that in determining what is a reasonable time regard is to be had to the nature of the instrument, the usages of trade, and the facts of the particular case, a demand note, upon which demand has not been previously made, will be considered as due for the purposes of presentment in four months after its date.

4.  Banks—President of Bank—Endorser of Discounted Paper—Entitled to Notice of Presentment and Dishonor.—The president of

a banking institution, who is endorser on paper discounted at the bank, and upon whom is not imposed the duty under the custom of the bank either to give notice of presentment and dishonor, or see that another does, is entitled as endorser to notice of dishonor just as any other endorser dealing with the institution.

5. Banks.—The president or other officer of a bank, who is the endorser of paper discounted at the institution, is dealing with the bank in his individual capacity, and for the purposes of the particular transaction his official connection with the bank is severed, and he must be treated as dealing with it at arm's length.

6. Debtor and Creditor—Liens.—A lien holder claiming the benefit of the equitable right to marshal assets as against another lien holder, must show that he has some enforceable claim against the debtor.

GEORGE S. SHANKLIN for appellant.

HUNT, BULLOCK & HUNT for appellee.

OPINION OF THE COURT BY JUDGE TURNER—Reversing in part on both the original and cross-appeals.

In an action by the executrix of D. F. Frazee, deceased, to settle his estate, the Phoenix National Bank presented numerous claims. This appeal, however, involves only four of them.

The judgment of the lower court allowed a part of one of the claims, two of them in full, and rejected another.

The executrix appeals from so much of the judgment as allowed any part of any of these claims, and the bank prosecutes a cross-appeal because of the lower court's rejection of part of one of its claims and the whole of another.

The first claim is for $9,742.50 which, it is asserted by the bank, has been held in trust by Frazee since December, 1905, for the purpose of being applied upon the indebtedness of M. C. Alford to it.

The second claim is for a $500 note executed to the bank by Alice McConathy and M. C. Alford in May, 1905, and which it is asserted by the bank should be paid out of the trust fund mentioned in claim No. 1 if it is not entitled to a judgment for the whole of that fund.

The third claim is one for $2,716.25, a note payable on demand executed August 20th, 1908, by M. C. Alford to Frazee and endorsed and discounted by him to the bank.

The fourth claim is for $2,261, a note dated April 22, 1908, and due in six months, executed by John McClin-

tock to Frazee, and endorsed and discounted by him to the bank.

The lower court entered a judgment against appellant for $4,464.47 with interest from January, 1906, on the first claim, that being the amount of the unpaid indebtedness of Alford to the bank which was in existence at the time the trust fund came into Frazee's hands, other than the McConathy and Alford note for $500, which seems to have been treated by the court as separate and distinct from the other obligations of Alford to the bank, evidently because of the fact that he was only surety thereon, whereas he was principal in all the others.

The judgment as to this first claim seems to have been based upon the idea that this trust fund could not be subjected to the payment of any of Alford's indebtedness to the bank except such indebtedness, now unpaid, as actually existed at the time of the creation of the trust.

The lower court also entered a judgment on the $500 McConathy and Alford note upon the theory that it was a debt of Alford in existence at the time of the creation of the trust, and therefore payable out of that fund, and also on the $2,716.25 note; but rejected the claim for $2,261 on the McClintock note.

We will consider these claims in the order named.

None of these claims have been presented by pleading, but were presented as claims against the estate accompanied by the customary affidavits.

As to the first claim the affidavit made by the president of the bank is that on or about December 2nd, 1905, M. C. Alford was indebted to the bank in a large sum and had pledged to it as collateral to secure the same 260 shares of the capital stock of the Phoenix Hotel Company; that Frazee was then the president of the bank, and at the instance and request of Alford sold on the 2nd of December, 1905, the 260 shares of stock for the sum of $26,000 for the purpose of satisfying to that extent the debts of Alford to the bank; that Frazee collected said sum of $26,000 and out of the same paid to the bank on Alford's indebtedness thereto the sum of $16,257.51, and that he held the balance of said fund amounting to $9,742.50 in trust under an agreement with the bank and Alford that the same should be paid to the bank and applied upon the indebtedness of Alford. The affidavit further states that Alford was at that time,

and had been continuously since December 2nd, 1905, in-
debted to the bank in a sum in excess of $9,742.50 with
six per cent interest thereon.

To this claim numerous exceptions were filed denying
that any such trust existed or had ever existed, or that
the bank held the collateral except for the purpose of
securing the payment of one $15,000 note which had
been paid. It was further asserted by the executrix that
Alford was, at the time and had ever since been, in-
debted to Frazee in a sum in excess of $9,742.50, and that
Frazee had applied this balance of the fund to the pay-
ment of such indebtedness, and that he being in posses-
sion of the same had a right so to do. On the other hand
it was contended by the bank that the shares of stock
were held by it as general collateral to secure not only
the $15,000 note of Alford, but any other indebtedness of
his to the bank then existing or thereafter created; that
the deposit of the stock was intended not only as col-
lateral to secure any existing indebtedness, but to give
Alford credit at the bank, and therefore was intended to
secure any future indebtedness as well.

The undisputed facts are that prior to December 2nd,
1905, Alford was the owner of 500 shares of capital stock
of the Phoenix Hotel Company; that 250 of those shares
were held as collateral by the Phoenix National Bank,
and the stock certificate for same was attached to a note
of his to that institution for $15,000; that the other
250 shares were held by Scott and Frazee as collateral
to secure the payment of a $22,500 debt owing them by
Alford; that on the 2nd of December, 1905, Frazee, by
and with the consent of the bank of which he was then
president, and Scott and Alford, took from the bank the
250 shares of stock held by it, and 10 shares of stock held
by Scott and Frazee, and sold the 260 shares for $26,000;
that the remaining 240 shares so held by Scott and
Frazee were subsequently disposed of, and fully paid off
the $22,500 debt. So that the 10 shares, which had been
formerly held by Scott and Frazee as collateral, and
which by agreement were placed and sold with the 250
shares held by the bank, will be treated as a part of the
collateral held by the bank because the parties, by the
arrangement made between them, seem to have so
treated them.

Several witnesses testified as to the facts bearing upon
the existence of this alleged trust, among them being
Rodes, who was at the time of the transaction involved,

the cashier of the bank and a stockholder therein, and who, at the time of the giving of his testimony, was the president of the bank and still a stockholder therein; and Alford, who was the debtor of the bank, and who, it is apparent, was directly interested in the establishment of the trust, because, if established, it will reduce his indebtedness to the bank.

It is insisted for the executrix that under the provisions of Section 606 of our Civil Code neither of these witnesses was competent to testify against Frazee after his death. But we do not deem it necessary to go into that question, for we have concluded that if the evidence of these two witnesses be entirely eliminated, there is still abundant competent testimony to establish the trust.

Mr. W. L. Yerkes, who in 1908 was a National Bank examiner, states that in the spring of that year he made an examination of the Phoenix National Bank, and finding the indebtedness of Alford to that institution very large, and as he thought not properly secured, he called attention of Frazee, then the president of the bank, to these facts. Using his own language, he says:

"In the examination of the bank I objected very seriously to the indebtedness of M. C. Alford. I considered the indebtedness was excessive in amount and was not properly secured, and I talked to Mr. Frazee along that line very seriously. I thought the indebtedness ought to be paid, a part of it, and the rest of it better secured. In the course of the conversation, Mr. Frazee told me that he had in his hands either a sum of money amounting to about $10,000 or securities amounting to $10,000, which were to be used in the payment of that debt. My understanding, from Mr. Frazee's conversation, was that this money, or these securities, was the property of M. C. Alford * * *. I cannot state distinctly what Mr. Frazee said, but it was to the effect that he had this sum of money, or those securities, which were to be applied to the indebtedness of Mr. Alford. I am inclined to think it was money. But about that I am not positive * * *. I called his attention to the fact that the indebtedness of Mr. Alford amounted to about $30,000, which I thought was a very excessive sum, and I did not think it was properly secured. And then he assured me that he had this sum of money, or securities, which amounted to that sum, which would be applied to the payment of the debt."

Percy H. Johnson testifies that he also was a National Bank examiner, and that on the 18th day of August, 1908, made an examination of the Phoenix National Bank. He testifies as follows:

"On August 18th, 1908, examination, I was in the bank probably two or three days making the examination, and at that time M. C. Alford was indebted to the bank in the sum of $26,000 or $27,000; the total amount of his indebtedness. I was making a special examination on extension of charter and I noticed that Mr. Alford was short in his collateral something like $11,000; that is, the value of his collateral would not pay his loans for that much. I took the matter up with Mr. Stiltz, going over the paper. I took this matter up with Mr. Stiltz— that Alford's paper was deficient. Mr. Stiltz brought out an envelope that contained a statement that I remember of some collateral that belonged on the Alford loan. This statement showed that there was some stock in the Phoenix Hotel Company that had been placed on the indebtedness of Mr, Alford. The stock was not there. Mr. Stiltz stated that Mr. Frazee had taken the stock. I asked that Mr. Rodes be brought back to the directors' room in order that I might interview him with regard to this matter; and he stated that Mr. Frazee had taken this Phoenix Hotel stock and he thought had disposed of it. At this point I asked that Mr. Frazee be brought down to the bank. He was ill at the time, or indisposed, but able to be about at home. He came down to the bank during the examination, and in the presence of Mr. Stiltz and Mr. Rodes I asked Mr. Frazee a question with reference to his taking down the Phoenix Hotel stock. He stated that he was interested in the stock and had taken the stock off the loan, had disposed of it and would pay the money into the bank; it amounted to about $11,000. In fact, he stated that he would see that all the Alford indebtedness was paid to the bank, he said he would see that it was all paid."

J. Wood Browning, Alford, and Frazee were each interested in a development corporation, known as the Mentelle Company, which had become very much involved; and in the fall of 1908, after Frazee's health had failed, Browning went up to his home several times in an effort to have renewed certain notes of that company. On one of those occasions he had a conversation with Frazee touching this fund growing out of the sale

of the Phoenix Hotel stock, and testifies about that conversation as follows:

"Yes, the second or third time that I tried to get the notes renewed, I said to him, 'Mr. Frazee, Governor Alford says you have got $10,000 of his money in your hands.' He said, 'Yes, but that cannot be used for these debts, and, besides, Mr. Alford owes me a lot of money. If you will get Mr. Alford to come up here and settle his personal account with me, all these matters then can be arranged and he will have some credit in the bank then and he can go ahead and carry this company out. That is the substance of it. * * *.' When I said, 'Mr. Alford claims you have $10,000 of his money in your hands,' he just said that that could not be used for his debt. There were a lot of old notes in the bank and when they were paid off Mr. Alford would have good credit then and could go ahead with this company."

It is perfectly apparent from these conversations that as late as the fall of 1908, a few months before his death, Frazee clearly and distinctly recognized that the bank had, as between himself and it, a prior equity and claim to the proceeds of the Phoenix Hotel stock sold by him. No other reasonable interpretation can be placed upon his statements in these several conversations than that he held this fund in trust for the payment of Alford's indebtedness to the bank; and nothing is to be gleaned from the testimony that he (Frazee) treated that trust as applying only to the unpaid indebtedness of Alford which existed when the trust was created in December, 1905. On the contrary his direct and positive statement to the bank examiners, who had in the spring and in August, 1908, called his attention to the fact that the indebtedness of Alford to the bank was not sufficiently secured, that he had that amount in his hands belonging to Alford which was to be applied to Alford's *then* indebtedness to the bank, is conclusive that he understood the trust to extend to and cover any indebtedness of Alford, whether it existed in December, 1905, or had been thereafter created. Why Frazee had not paid into the bank this fund, and applied the same on the indebtedness of Alford, between December, 1905, and February, 1909, when he died, is very clearly explained by certain facts which are shown in the record to the effect that during that period Frazee had engaged in some very disastrous speculations and was a heavy borrower.

But it is the contention of counsel for the executrix that these statements of Frazee did not amount to the creation of a trust, but were, at most, only the expression of his purpose in the future to apply this fund in his hands, which was the proceeds of Alford's property, to the payment of Alford's indebtedness to the bank; and in support of this position relies upon the case of Brown v. Brown, 129 Ky., 138, and the authorities there cited. It is true, that in order to fasten a trust upon personal property by parol declaration, the subject of the trust, as well as the *cestui que trust*, must be definitely declared and the language used must be clear and explicit. But in the light of the admitted facts in this case, viz., that Alford owned the 260 shares of stock, that they were sold by agreement between him and those who held them as collateral, that the fund was paid into Frazee's hands, and that the stock had been previously pledged to the bank, when taken in connection with the statements and admissions of Frazee to the two bank examiners and Browning, can be given no other reasonable interpretation or effect than a recognition by Frazee that he had all the time held this fund for the purpose of paying Alford's debts to the bank. It may be quite true that Frazee's statements or admissions to these witnesses would not, in and of itself, have created a trust, but they were very convincing evidence that such a trust had been previously created and was then in existence. In fact these statements of Frazee, taken in connection with the admitted facts in the record, were conclusive that the trust was created in the first place, for if it had not been, certainly Frazee, who claimed that Alford owed him large sums, would not in 1908 have recognized the prior equity of the bank to this fund, but would have asserted his right to have it applied to the indebtedness claimed by him against Alford.

It is proper to say, however, that there is nothing in the record to create the least suspicion that if Frazee had lived he would not have faithfully carried out this trust; on the contrary his very frank statements and admissions to the three witnesses evidenced an unmistakable purpose on his part to carry it out.

The case is unlike the case of Brown v. Brown, and cases of that class, where loose, uncertain, and inexplicit language is relied upon to create parol trusts; here the bank is not relying upon these statements of Frazee as creating this trust, but is relying upon them, when con-

sidered in the light of other facts in the record, to establish the fact that a trust had been previously created. Upon this branch of the case, therefore, we have concluded that the bank has established the trust, and is, therefore, entitled to a judgment for the whole of this fund.

The $500 McConathy and Alford note was allowed against the estate of Frazee by the lower court upon the idea that as it was an unpaid debt in existence in December, 1905, at the time of the creation of the trust, it should be paid out of the trust fund. But, as we have concluded that the bank is entitled to a judgment for the whole of this trust fund, it follows that the judgment for this $500 note is erroneous, because Frazee was never in any way bound upon that note as endorser or otherwise.

The third and fourth claims present the question whether the Frazee estate by reason of his endorsement of the two notes in question is liable thereon. One of them is a note for $2,716.25, payable on demand, executed Aug. 20th, 1908, by Alford to Frazee, and endorsed and discounted by him to the bank. The other is a note for $2,261, dated April, 22nd, 1908, and due in six months, executed by John McClintock to Frazee, and endorsed and discounted to him by the bank. It will be observed that one of these is a demand note, and the other a six months' note, the latter falling due about four months before the death of Frazee.

The first question presented is when the demand note for $2,716.25 should have been presented for payment, and notice of dishonor given. Our Negotiable Instruments Act (Section 3720b, Kentucky Statutes) Sub-section 71 provides:

"Presentment on Maturity.—Where the instrument is not payable on demand, presentment must be made on the day it falls due. Where it is payable on demand, presentment must be made within a reasonable time after its issue, except that in the case of a bill of exchange, presentment for payment will be sufficient if made within a reasonable time after the last negotiation thereof."

Sub-section 192 of the same Act provides:

" 'Reasonable Time' and 'Unreasonable Time'—In determining what is a 'reasonable time' or an 'unreasonable time' regard is to be had to the nature of the instrument, the usage of trade or business (if any) with re-

spect to such instruments, and the facts of the particular case."

This demand note was dated the 20th day of August, 1908, just six months before the death of Frazee, and the question is, under the terms and the spirit of that Act, when should there have been a presentment for payment and notice of dishonor? It is a matter of common knowledge that in the banks of Central Kentucky commercial paper is rarely permitted to run longer than four months without renewal, and it may be said to be a custom, or usage of trade, that such paper is ordinarily payable within that time. Such being the usage of trade this note should have been treated as due at least on the 20th day of December, 1908, no demand having been previously made thereon, and Frazee was entitled to notice of dishonor thereof immediately thereafter, unless his position as president of the bank at which it was payable, and to which he had endorsed it, would operate as a waiver of such notice to him.

So that treating this note as due on the 20th of December, 1908, and the other note as due on the 22nd of October, 1908, which it was by its terms, we have the remaining question whether Frazee, by reason of his position as president of the bank, was entitled to notice of dishonor. If he was entitled to such notice he is released because he did not have it; if his position as president of the bank must operate as a waiver of such notice to him, then his estate is liable.

Sub-section 89 of the Negotiable Instruments Act reads as follows:

"Notice of Dishonor.—Except as herein otherwise provided, when a negotiable instrument has been dishonored by non-acceptance or non-payment, notice of dishonor must be given to the drawer and to each endorser, and any drawer or endorser to whom such notice is not given is discharged."

This precise question was involved as to the vice-president of a banking institution in the case of First National Bank v. Bickel, 154 Ky., 11. In that case Bickel, who was vice-president of the bank, had endorsed the paper of another corporation in which he was interested, and the same had been discounted by the bank. It was urged that he, as vice-president of the bank, had actual knowledge when the paper fell due, and that the other corporation had no funds with which to meet it, and that he, being an officer of the bank, it was his duty to

see that notice of dishonor should be given, and that he was estopped to deny that it had been given. The court said in response to this argument:

"We do not know of any authority, and have not been referred to any by counsel for appellant, holding that the vice-president of a bank is, by virtue of his office alone, charged with the duty of seeing that notice of the dishonor of paper is given to the person entitled thereto or liable in any manner if he fails to do so. Of course the vice-president of a bank or the president or any director, or indeed any other officer or employe might be charged by resolution of the bank or by its habit and custom of dealing with the duty of protesting paper or giving notice of its dishonor, but there is no showing in these cases that Bickel had ever been authorized by the bank to do these things or that there was any custom of the bank under which he did or should do them; and the vice-president of a bank, simply because he is vice-president, is under no duty to attend to these matters and is not to be held liable for his failure to do so * * *. It is usual and customary for the cashier of the bank to look after matters of this kind, and in the absence of any showing that it was not the custom of the cashier of the First National Bank to attend to the protesting of paper and the giving of notice of dishonor, we must presume that it was the duty of the cashier to have discharged this duty in respect to these notes."

It was also urged that inasmuch as Bickel was an officer of the bank no notice of dishonor to him was necessary, and the court in response to this said:

"Nor do we think that the fact that Bickel was an officer of the bank relieved the bank from the necessity of giving him notice. Bickel signed the paper not as an officer of the bank, but as an officer of another corporation borrowing money from the bank, and his rights and liability on the paper are precisely the same as those of the other parties who signed it. The statute, requiring that notice of dishonor shall be given, is peremptory, and all persons entitled to the notice are released from liability unless it is given, although they may be connected with the bank, whose duty it is to give notice, as officers or in some other capacity, with the exception that the bank officer whose duty it was to give notice would be of course estopped to plead want of notice as a defense to a suit by the bank against him."

In the case of Ennis v. Reynolds, 127 Ga.; 112, it was claimed that no notice to the endorser of a note, who was also the president of the bank at which it was payable, was necessary, and the court in answer to that argument, said:

"It is claimed because the endorser was the president and director of the bank at which the note was payable, that no notice or protest was necessary; that the fact of the relation the endorser bore to the bank at which the note was payable amounted to a waiver on his part of any notice to him of what took place at the bank of which he was an official. We do not think that this fact could be properly treated as amounting to the waiver of the right which the endorser has under the law to receive notice of dishonor. It may be that the bank with which the note was deposited for collection would be liable to the holder in damages in the event that the failure to give the notice was due to its negligence; and if the bank was so held liable, the agent or officer whose negligent act thus rendered it liable might be liable to the bank; but the fact that such a liability might exist on the part of the bank, or one of its officers or agents, would not render the endorser liable on a paper when the notice of dishonor was not given to him at the time and in the manner drescribed by law."

There is nothing in this record showing that under the rules of the bank, or any custom followed by it, it was the duty of the president to give notice of dishonor of paper payable at the institution, or that the duty was in any way imposed on him by the bank to see that the notice was given. The same was true in the Bickel case as to the vice-president of a bank. Frazee not being charged with the duty of giving notice or seeing that the notice was given, he, under the rulings cited, was entitled to notice as any other endorser.

The reason of the rule seems to be that where the president or other officer of the bank is dealing in his individual capacity with the institution he, for the time, and for the purposes of the particular transaction, throws aside his official connection with the bank, and must therefore be considered as dealing with it at arm's length just as others would. We have therefore concluded that Frazee, as endorser, was entitled to notice of the dishonor, and none having been given, under the express terms of the statute, he was released from liability as such.

During the period covered by these transactions between Alford and the bank it appears that the bank held as general collateral in addition to the Phoenix Hotel stock several hundred shares of the stock of the Central Kentucky Natural Gas Company, and it is urged by the appellant that in any event Frazee's estate is entitled to a marshalling of assets so as to acertain how much of these debts are either secured or have been paid by the other collateral held by the bank. But it is sufficient to say in answer to this contention there is nothing in the record of a tangible nature showing that Alford owed Frazee anything other than the $22,500 note which it is admitted has been paid.

It is true that Frazee told Browning in the fall of 1908 that, "Alford owes me a lot of money," and it is true that the witness, Scott, testified that he told Alford that Frazee claimed that Alford owed him "thousands of dollars"; but such loose, uncertain, and general expressions by Frazee in the absence of Alford without any specification, whatever, and with nothing in this record to show what those claims were or upon what they were based, is no foundation upon which a marshalling of assets may be had.

Surely a lienholder claiming the benefit of the equitable right to marshal assets must show that he has some enforceable claim against the debtor.

For the reasons given the judgment is reversed on both the original and cross-appeal, with directions to enter a judgment as herein indicated.